## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| COMMONWEALTH OF PUERTO RICO, | Civil No. |
| Plaintiff, | |
| v. | |
| AGRI STATS, INC., THE CLEMENS FAMILY CORPORATION, CLEMENS FOOD GROUP, LLC, HORMEL FOODS CORPORATION, HORMEL FOODS, LLC, INDIANA PACKERS CORPORATION, JBS USA FOOD COMPANY, JBS USA FOOD COMPANY HOLDINGS, MITSUBISHI CORPORATION (AMERICAS), SEABOARD FOODS, LLC, SEABOARD CORPORATION, SMITHFIELD FOODS, INC., TRIUMPH FOODS, LLC, TYSON FOODS, INC., TYSON FRESH MEATS, INC. AND TYSON PREPARED FOODS, INC. | COMPLAINT |
| Defendants. | DEMAND FOR JURY TRIAL |

The Commonwealth of Puerto Rico ("Puerto Rico" or "Plaintiff") brings this action in its sovereign capacity against Defendants Agri Stats, Inc. ("Agri Stats"), Clemens Food Group, LLC and The Clemens Family Corporation (together and separately, "Clemens"), Hormel Foods Corporation and Hormel Foods, LLC (together and separately, "Hormel"), Indiana Packers Corporation and Mitsubishi Corporation (Americas) (together and separately, "Indiana Packers), JBS USA Food Company and JBS USA Food Company Holdings (together and separately, "JBS USA), Seaboard Foods LLC and Seaboard Corporation (together and separately, "Seaboard"), Smithfield Foods, Inc. ("Smithfield"), Triumph Foods, LLC ("Triumph"), and Tyson Foods, Inc., Tyson Fresh Meats, Inc. and Tyson Prepared Foods, Inc. (together and separately, "Tyson") (collectively, the "Defendants") on behalf of itself and as *parens patriae* on behalf of the population of Puerto Rico.

## I.    NATURE OF ACTION

1.      The pork integrator-defendants are the leading suppliers of pork in an industry with approximately $20 billion in annual commerce. The pork industry is highly concentrated, with a small number of large producers in the United States[1] controlling supply. Defendants and their co-conspirators collectively control upwards of 80 percent of the wholesale pork market.

2.      Defendants entered into a conspiracy from at least 2009 through the present (the "Relevant Time Period") to fix, raise, maintain, and stabilize the price of pork.[2] The principal, but not only, method by which Defendants implemented and executed their conspiracy was by coordinating their output and limiting production with the intent and expected result of increasing pork prices in the United States. In furtherance of their conspiracy, Defendants exchanged detailed, competitively sensitive, and closely guarded non-public information about prices, capacity, sales volume, and demand through their co-conspirator Agri Stats.

3.      Since at least 2009, Agri Stats began providing highly sensitive "benchmarking" reports to the majority of pork integrators. Benchmarking allows competitors to compare their profits or performance against other companies' performances. However, Agri Stats's reports are unlike those of other lawful industry reports. Agri Stats gathers detailed financial and production data from each of the pork integrators, standardizes this information, and produces customized reports and graphs for the co-conspirators. The type of information available in these reports is not the type of information that competitors would provide each other in a normal, competitive market. Instead of holding a regular meeting or conference, Agri Stats collected the pork integrators' competitively sensitive supply and pricing data and intentionally shared that information through detailed reports that it provided to the pork integrators. On a weekly and monthly basis, Agri Stats

---

[1] The term "United States" includes the United States territory, Puerto Rico.
[2] For purposes of this complaint, "pork" includes pig meat purchased fresh or frozen, smoked ham, sausage, and bacon.

provides the pork integrators with current and forward-looking sensitive information such as profits, costs, prices, and slaughter information. Moreover, Agri Stats regularly provides the keys to deciphering which data belongs to which producers. The purpose and effect of this information exchange was to allow the pork integrators to monitor each other's production so that they could control supply and price.

4.      The data exchanged through Agri Stats resembles the enforcement mechanism of a price-fixing scheme. First, the data is current and forward-looking, which courts have consistently held have "the greatest potential for generating anticompetitive effects."[3] Second, information contained in Agri Stats reports is specific to the pork producers, including information on profits, prices, costs, and production levels. "Courts prefer that information be aggregated in the form of industry averages, thus avoiding transactional specificity."[4] Third, none of the Agri Stats information was publicly available. Agri Stats is a subscription service, which required the co-conspirators to pay millions of dollars over the Relevant Time Period. This is far in excess of any other pricing and production index. "Public dissemination is a primary way for data exchange to realize its pro-competitive potential."[5] Agri Stats made sure that its detailed and sensitive business information was only available to the co-conspirators and not to any buyers in the market.

5.      Moreover, the pork integrators admitted in public calls that they had discussed production cuts at least once, and publicly signaled to each other that no supply increases would happen.

6.      Additionally, there are numerous "plus factors" in the pork industry during the Relevant Time Period, including but not limited to multiple industry characteristics which facilitate

---

[3] *Todd v. Exxon Corp.*, 275 F.3d 191, 2011 (2d Cir. 2001) (Sotamayor, J.) (quoting *United States v. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).
[4] *Id*. at 212.
[5] *Id*. at 213.

collusion, including a high level of vertical integration, high pork industry consolidation and concentration, barriers to entry preventing competitors from coming into the market, inelastic demand for pork, and homogeneity of pork as a product.[6] These plus factors add plausibility to Plaintiff's allegations of a price-fixing scheme.

7.      Defendants' restriction of pork supply had the intended purpose and effect of increasing pork prices to Plaintiff. Beginning in 2009, the earning of the pork integrators began to increase as they took an increasing amount of the profits available in the pork industry. As a result of Defendants unlawful conduct, Plaintiff paid artificially inflated prices for pork during the Relevant Time Period. Such prices exceeded the amount they would have paid had the price for pork been determined by a competitive market. Accordingly, Plaintiff was injured by Defendants' conduct.

## II.      JURISDICTION AND VENUE

8.      Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C § 1). Plaintiff also brings these state law claims to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by Defendants' conduct in restricting the supply of pork and increasing the price of pork. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

9.      Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because one or more Defendants resided or transacted business in this District, is licensed to do business

---

[6] Pork is homogenous within cut type – i.e., a pork belly from Tyson and Smithfield are virtually indistinguishable.

or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

10.     This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of pork throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

11.     The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

### III.     PARTIES

12.     Plaintiff is the Commonwealth of Puerto Rico, who brings this action on behalf of itself and as *parens patriae* on behalf of Puerto Rico residents, under the laws of Puerto Rico, to ensure compliance with Puerto Rican laws and to enjoin violations of Puerto Rican laws.

13.     Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana and is a subsidiary of Eli Lilly & Co. Throughout the Relevant Time Period, Agri Stats acted as a co-conspirator of the pork integrator-defendants by facilitating the exchange of confidential, proprietary, and competitively sensitive data among Defendants and their co-conspirators.

14.     The Clemens Family Corporation is a Pennsylvania corporation headquartered in Hatfield, Pennsylvania. During the Relevant Time Period, The Clemens Family Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate

commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

15.      Clemens Food Group, LLC is a limited-liability company headquartered in Hatfield, Pennsylvania and is a wholly owned subsidiary of The Clemens Family Corporation. During the Relevant Time Period, Clemens and/or predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

16.      Hormel Foods Corporation is a Delaware corporation engaged in the production of meat and food products, and the marketing of these products. During the Relevant Time Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

17.      Hormel Foods LLC is a limited liability corporation headquartered in Austin, Minnesota. It is a wholly owned subsidiary of Hormel Foods Corporation. Hormel is engaged in the production of meat and food products, and the marketing of these products. During the Relevant Time Period, Hormel Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

18.      JBS USA Food Company Holdings is a subsidiary of Brazilian-based JBS SA. JBS Food Company Holdings is a Delaware corporation, headquartered in Greeley, Colorado. JBS USA Food Company Holdings holds a 78.5 percent controlling interest in Pilgrim's Pride Corporation, one of the largest chicken-producing companies in the world. During the Relevant Tiem Period, JBS USA and/or its predecessors, wholly owned or controlled subsidiaries, or

affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

19.     JBS USA Food Company is a subsidiary of JBS USA Food Company Holdings and is a Delaware corporation, headquartered in Greeley, Colorado. It is one of the world's largest beef and pork processing companies. During the Relevant Time Period, JBS USA Food Company and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

20.     Mitsubishi Corporation (Americas) is a New York corporation and is a subsidiary of Mitsubishi Corporation, Tokyo, which operates as a wholesaler of groceries, textiles, petroleum products, metals, and industrial machinery. Mitsubishi Corporation (Americas) wholly owns and controls Indiana Packers Corporation. During the Relevant Time Period, Mitsubishi Corporation (Americas) and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

21.     Seaboard Corporation is a Delaware corporation headquartered in Shawnee Mission, Kansas. Seaboard Corporation produces and sells frozen pork products to further processors, food service operators, grocery stores, distributors and retail outlets throughout the United States. During the Relevant Time Period, Seaboard and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

22.     Seaboard Foods LLC, a wholly owned subsidiary of Seaboard Corporation, is a limited-liability company headquartered in Shawnee Mission, Kansas. During the Relevant Time

7

Period, Seaboard and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

23.      Smithfield Foods, Inc. is incorporated in the Commonwealth of Virginia, and an indirect wholly owned subsidiary of WH Group Limited, the largest pork company in the world. Smithfield Foods is headquartered in Smithfield, Virginia. During the Relevant Time Period, Smithfield Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

24.      Triumph Foods, LLC is a limited-liability company headquartered in St. Joseph, Missouri. During the Relevant Time Period, Triumph Foods and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

25.      Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. It wholly owns and controls two subsidiaries, Tyson Prepared Foods, Inc. and Tyson Fresh Meats Inc., that slaughter and sell pork products. During the Relevant Time Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

26.      Tyson Fresh Meats Inc. is a Delaware corporation that operates as a subsidiary of Tyson Foods, Inc. During the Relevant Time Period, Tyson Prepared Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate

commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

27.         Tyson Prepared Foods, Inc. is a Delaware corporation that operates as a subsidiary of Tyson Foods, Inc. During the Relevant Time Period, Tyson Prepared Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

## IV.    FACTUAL ALLEGATIONS

28.         Starting in at least 2009 and continuing to the present, Defendants coordinated to fix, raise, maintain and stabilize pork prices. To effectuate and ensure the stability of their price fixing agreement, Defendants relied on a unique industry data sharing service known as Agri Stats. Agri Stats provided a means for Defendants to obtain and monitor critical and competitively sensitive business information regarding each other's production metrics, thereby serving as a central and critical part of Defendants' price-fixing scheme, resulting in a remarkably stable and successful anticompetitive cartel.

### A. The price-fixing scheme started from Agri Stats's central role in collusion in the broiler industry.

29.         Agri Stats has played a central role in other industries, including collusion in the broiler industry.[7] As alleged in the *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill.), the broiler producers used Agri Stats as a part of their conspiracy to restrain production and inflate prices.

30.         In the broiler industry, Agri Stats collected and disseminated to the other members of the conspiracy disaggregated financial information (such as monthly operating profit, sales and

---

[7] Broilers are chickens raised to be slaughtered before the age of 13 weeks.

9

cost per live pound), production volumes, capacity, slaughter information, inventory levels, sales data for finished product form and type, amongst other pieces of competitively sensitive business information. The Agri Stats reports contain line-by-line entries for plants, lines, and yields of various broiler facilities. Agri Stats relied upon (and the coconspirators agreed to) a detailed audit process to verify the accuracy of data from each broiler producer's complex, sometimes directly contacting the broiler defendants to verify the data. Agri Stats also provided detailed price reports to the broiler industry through its subsidiary, Express Markets, Inc. or EMI. Agri Stats collected data from the broiler producers on a weekly basis and provided its reports to broiler producers on a weekly and monthly basis.

31.     The detail of these reports ensured that competitors could quickly decode the information of their erstwhile competitors. The *Broiler* complaints allege it was common knowledge that the detail of the Agri Stats reports allowed any reasonably informed producer to discern the identity of the competitors' individual broiler complexes. The broiler reports, in parts, contained so few producers participating that the identities were obvious. Other reports contained such detailed data that it could be matched with the publicly stated aggregate data for larger broiler defendants such as Tyson. The complaints allege that Agri Stats purposefully circulated this information to top executives to facilitate agreement on supply, constraints, and price.

32.     In the broiler industry, it is also alleged that Agri Stats – known to its co-conspirators to be a willing and informed conduit for illicit information exchanges – used public and semi-public forums to convey messages to industry participants that furthered the purposes of the conspiracy by reassuring conspirators that production cuts would continue, and by inducing them to continue to act in concert to ensure they did. Agri Stats' own statements in the broiler

industry facilitated the implementation of the agreement to restrict supply – where Agri States would transmit the intentions of the broiler producers to restrict supply.

33.     The district court, in denying the motions to dismiss in the *In re Broiler Chicken Antitrust Litigation*, noted that given the nature of the Agri Stats reports, the defendants were in fact sharing future anticipated production information with one another, which suggests high antitrust concerns.[8]

**B. Agri Stats marketed its collusive scheme to pork integrators after success in the broiler industry.**

34.     Beginning in at least 2008, Agri Stats began to propose a series of benchmarks to the swine industry along the lines of the benchmarks used to restrict competition in the broiler industry. Benchmarking is the act of comparing practices, methods, or performance against those of other companies. The type of benchmarking undertaken by Agri Stats and its co-conspirators reduces strategic uncertainty in the market and changes the incentives for competitors to compete, thereby enabling companies to coordinate their market strategies and otherwise restrict competition. This is especially true where benchmarking involves the exchange of commercially sensitive information between competitors.

35.     In 2008, Greg Bilbrey of Agri Stats stated to swine industry producers that "Benchmarking in the swine industry could range from simple production comparisons to elaborate and sophisticated total production and financial comparisons. Each and every commercial swine operation is encouraged to participate in some benchmarking effort."

36.     Agri Stats emphasized pork producers that the goal of the conspiracy was profitability, not production, and invited pork producers again, to participate in the benchmarking.

---

[8] Memorandum Opinion and Order at 11, *In re Broiler Chicken Antitrust Litigation*, No. 16-cv-08637 (N.D. Ill. Nov. 20, 2017), ECF No. 541.

Agri Stats stated, "[w] must remember that the ultimate goal is increasing profitability – not always increasing the level of production." Furthermore, Agri Stats told the industry that "[e]ach swine production company should be participating in some type of benchmarking. To gain maximum benefit, production, cost and financial performance should all be part of the benchmarking program."

37.      In April 2009, Agri Stats again invited pork producers to design and operate their own benchmarking effort. Greg Bilbrey of Agri Stats invited swine producers to design and operate their own benchmarking effort: "Though all producers may not be part of or fit into an Agri Stats type benchmarking program, all producers could participate in benchmarking in some way. Commercial benchmarking opportunities are availabl. Producer groups could design and operate their own benchmarking effort."

38.      The pork producers accepted this offer, and beginning no later than 2009, created the detailed benchmarking scheme based upon and found in the Agri Stats reports. The agreement between Defendants was to use the exchanged benchmarking information to reduce the supply and stabilize the prices of pork sold in the United States, to provide and receive information from Agri Stats, and to use this detailed sensitive information for the purposes of monitoring each other's production and pricing. As set forth below, so as to maintain a reduction of production and an increase of price. The agreement was successful as prices rise significantly after the agreement was reached.

39. Total pork sales in the United States have been:

2016: $18.9  billion
2015 - $21.0 billion
2014 - $26.4 billion
2013 - $23.4 billion

40.        Each Defendant's annual sales of pork products is immense. For examples, in 2016, Smithfield reported $3.7 billion of fresh pork sales, and an additional $5 billion in packaged pork product sales. Also in 2016, Tyson reported $4.9 billion in pork sales. With such staggering revenues, the ability to stabilize or increase the margin even in small amounts has enormous consequences to profits.

### C.   Agri Stats provided pork integrators the unparalleled ability to monitor, or discipline co-conspirators for not complying with the collusive agreement.

41.        Agri Stats provided pork integrators with an unparalleled ability to share critical and proprietary information concerning key business metrics, such as production levels and short and long-term production capacity. Agri Stats was key to the formation, operation and continuing stability of the Defendants' price-fixing scheme. In order to organize an effective price-fixing agreement, the participants had to have confidence that each member was following through with the agreement by limiting their production and stabilizing prices. Agri Stats served that function here.

42.        Each member of the conspiracy, including swine integrators and Defendants Clemens, Hormel, Indiana Packers, JBS USA, Seaboard, Smithfield, Triumph, and Tyson, were all Agri Stats subscribers. Agri Stats' parent company, Eli Lilly, stated that "***over 90% of the poultry and pig market***" uses Agri Stats in the United States.

43.        Agri Stats collects participant financial and production data electronically each month. Internal auditors convert the data, prepare it for comparison and perform the monthly audits. Each company's financial data is reconciled to their general ledger to help ensure actual costs are reported. Raw numbers are used in Agri Stats's standardized calculations, so all company numbers are calculated the same way.

44.     Participants in the scheme received monthly detailed reports and graphs that allow them to compare their performance and costs to other participants, the average of all companies, the top 25 percent and the top five companies. Current month, previous quarter and previous twelve-month periods are reported. As of 2009, each monthly report contained nine sections for analysis and comparison: Performance Summary, Feed Mill, Ingredient Purchasing, Weaned Pig Production, Nursery, Finishing, Wean-to-Finish, Market Haul, Profit and Sales. Participants may also receive an abbreviated Key Performance Indicator report, as well as, historical graphs.

45.     Because of the nature of the life of a hog, even current and historical information regarding the production numbers of hogs provides forward-looking supply information to competitors. The typical hog production cycle lasts about 4 years. This is a function of the hog biological cycle. Given the length of time needed to breed an existing sow, choose and retain offspring for breeding, and breed and rear the resulting crop of piglets, it takes nearly 2 years to substantially increase production. 81.

46.     One presentation from Agri Stats shows the level of detail provided to competitors regarding profits in the pork market:

**Top 25% in Profit - Variances to Average Company - 2009-2007**

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.69 | 107.27 | 98.93 |
| variance | 12 | | | 11 | 7 | | | | | | | |
| ranking | | 1 | 5 | | | 2 | 8 | 4 | 9 | 6 | 3 | 10 |
| 35,001,089 Pigs Finished | | | | | | | | | | | | |
| **2008** | | | | | | | | | | | | |
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.69 | 32.82 | 11.23 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 93.42 |
| variance | 11 | | | 10 | 6 | | 7 | | 8 | 9 | | 12 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |
| 30,785,319 Pigs finished | | | | | | | | | | | | |
| **2007** | | | | | | | | | | | | |
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.00 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 101.93 | 100.11 | 103.56 | 99.21 | 104.90 | 94.82 |
| variance | 11 | | | 10 | 7 | | 6 | 8 | 5 | 9 | | 12 |
| ranking | | 1 | 4 | | | 2 | | | | | 3 | |
| 22,306,500 Pigs finished | | | | | | | | | | | | |

47.     The purpose of these reports was not to provide better prices to consumers or to lower the costs of production. Instead, the clear purpose was to improve the profitability of the co-conspirators. The particular Agri Stats report referenced above shows the ranking of each company in profitability and compares the company to its competitors by providing the variance from the average. On information and belief, the Agri Stats report actually circulated to competitors contained even further detail. The same presentation informed pork integrators that one of the "Advantages for Top 25% in Profit" was the "Sales Price: $2 - $6/ckg." (CKG refers to 100 kilograms.) This underlines that the purpose of these reports was not to allow consumers to save more money through lower prices and more efficient production – in fact, the opposite was true, the purpose was the profitability of the defendant companies and the impact was higher sales prices for consumers.

48.     Much of the information shared by Agri Stats and the co-conspirators was unnecessary to achieve any benefits for consumers. Exchanging individual company data (particularly current data on prices and costs), is not required to achieve major efficiencies.

49.      Agri Stats knew that it played a central role in this conspiracy. Agri Stats repeatedly touted its role in standardizing the costs across companies – allowing the companies to compare the "apples to apples" of its data analysis between competitors. One presentation from Agri Stats spoke directly on this point, pointing out to industry participants that they could not undertake such a detailed cost analysis between competitors without Agri Stats auditing and standardizing the data:

## Data Integrity

- Benchmarking is very important but it is hard to make sure data is comparable across companies.
- Even if all companies include the same costs the costs can be calculated differently.
- Lots of variation in cost accounting in industry.
- Companies can select key metrics, common calculations and implement an effective benchmarking program.



50.      Agri Stats stated that to ensure data contained in the reports was accurate, the participants had to "agree on calculation and data collection procedures," they must "[d]etermine tolerance and outlier status and enforce," they must "[h]ave an administrator to compile the data and enforce procedures," and most importantly, "*[e]ach participant has to commit.*"

51.     In addition to these reports, Agri Stats' account managers conduct on-site live reviews to assist with report utilization and analysis. The information provided by Agri Stats was so detailed that clients frequently requested the site visits by Agri Stats employees to assist the co-conspirators in understanding the intricacies and implications of the data. Agri Stats' employees each possessed expertise in a specific area of production, and the value added by their insights was as important to the producers as the data in the books. The fee for the visits fluctuated based on the size and other factors.

52.     A common saying in the Agri Stats circle is "you cannot produce your way to the top of the page." Rather, Agri Stats has stated that "***the ultimate goal is increasing profitability*** – not simply increasing level of production."

53.     In May 2015, a subsidiary of Agri Stats, Express Markets, announced that it was adding its market analysis of pork to their product offerings in order to meet the broad information and knowledge needs of its customers. Express Markets started providing its extensive pricing reports to broiler producers in 2003.

54.     By providing detailed production statistics by producer, Agri Stats allowed each member of the conspiracy to monitor each other's ongoing adherence to agreed-upon plans for coordinated production limits. Critically, Agri Stats provided forward-looking data that allowed the co-conspirators to determine each other's future production in addition to their current production.

55.     Agri Stats reports are organized by company and facility, but the producers' names are not listed in the reports. Nevertheless, while nominally anonymous, the reports contain such detailed figures covering every aspect of pork production and sales that producers can accurately identify the companies behind the metrics. For example, long-time industry insiders are

sufficiently familiar with each other to identify unique but recurring data points for other companies, as well as identify the other companies by general metrics and size.

56.     Moreover, Agri Stats knew that the anonymity of its system was compromised by individuals who had gleaned knowledge of competitors' identification numbers, but reassigning numbers was an arduous undertaking the company was not eager to embark on.

57.     Suppliers received as many as one dozen books of data at the end of each quarter, augmented by smaller monthly update books featuring the latest year-to-date information. Within these smaller monthly books, each supplier's own rows of year-to-date numbers were highlighted. In the front of each book, there were also markings indicating whose numbers were inside the book. The front of the book also included information indicating which other companies were represented in the data, though which number represented each competitor was not revealed.

58.     Agri Stats mailed the reports to customers. On occasion, Agri Stats shipped a producer's book to one of its competitors. At times, suppliers just kept their competitors' books for future reference, which as noted above revealed the identity of that producer given that their numbers were highlighted by Agri Stats in their books.

59.     Mobility within the meat production industries led to a situation where many workers at most pork production operations knew the numbers of other regional facilities, removing any anonymization of the data which existed. Agri Stats would hire industry participants to work in their offices, and then they would return to the industry knowing each of the allegedly "anonymous" numbers. Those working at Agri Stats noticed this problem almost immediately but did nothing to fix the problem.

60.     Agri Stats' critical importance for a collusive scheme in the pork industry lies not only in the fact that it supplies the data necessary to coordinate production limitations and

manipulate prices, but also in its stabilizing power. Price-fixing cartels are subject to inherent instability in the absence of policing mechanisms, as each individual member of the cartel may have incentive to cheat on other members of the cartel, for example by ramping up pork production to capture higher prices as other cartel members act to limit production. Agri Stats' detailed production statistics serve as an indispensable monitoring function, allowing each member of the cartel to police each other's production figures (which were trustworthy because they had been verified) for signs of cheating.

### D.  Capacity and supply restraints during the Relevant Time Period

61.      As demonstrated in the following chart, at several points during the Relevant Time Period, the pork integrators acted in a concerted way to decrease supply. In 2009, 2019, and again in 2013, the pork industry cut production. The production dip in 2014 reflected the adverse impacts from the deadly pig disease, porcine epidemic diarrhea virus, which took place in the spring and summer of 2014. The decreases in production largely occurred after decrease in pork wholesale prices:



**U.S. Annual Commercial Hog Production by Weight, 2000-2017**



62.     In public earnings calls, Defendants made statements regarding their intentions to either stabilize or decrease supply. In May 2009, for instance, Larry Pope, the CEO and President of Smithfield stated:

> In terms of chronology of how I say we proactively managed this business, in February of last year—February of '08, not February of '09—we made the decision with the over-supply of livestock to take the leadership position and start reducing our sow herds because we saw the overproduction and the oversupplies of the hogs into the market, which was driving our hog market down. We started a reduction of 50,000 sows and 1 million of our 18 million pigs, we started taking out of the system.

63.     In May 2009, Hormel confirmed that "We see a contraction in the overall supply of hogs for the year but not as much as we'd originally anticipated. And I would expect that prices will be somewhat less than last year, but higher than what we've seen in the first half of the year."

64.     In June 2009, the CEO of Smithfield stated that the current cuts were not enough and more were needed to "fix" the hog industry:

> One of the things that we're doing is managing what you can do and the 3% relates to one of our operations and it's our -- I'll tell you, it's our Texas operation that sells pigs to seaboard. Seaboard knows that. . . . ***That 3%, let me say that, our 3% will not fix the hog industry. That part I'm confident of. Somebody else has got to do something.*** We cut 13%. The first 10% didn't fix it. I don't think us going from 10 to 13 is going to fix the hog business.

65.     In September 2009, the CEO of Smithfield stated:

> ***We can't solve the problem. But the answer to that is yes, I have had conversations with several sizable, more than sizable large producers, in fact very large producers, and I would tell you they are doing some liquidation***. But again, I don't think they can solve it.
>
> I think this industry has got to solve it collectively. I do believe everyone is now looking, and when I'm talking to people who are financially extremely strong and they are cutting back, that's got to be a statement about those people who are not financially strong. ***But the answer is, yes, there are others cutting back. We're not the only one.***

66.     The pork producers acknowledged access to information that allowed them to know that the supply of pork would not be increasing. For example, in December 2010, Larry Pope, the CEO of Smithfield stated:

> We certainly compare ourselves to our competitors as best we can. ***Given the information we think we have public plus what we think we know privately, how many they kill, what their processing levels are and things like to. This is information you may not quite have***. And we have been certainly impressed with how our competitors have been able to achieve margins that we have not been able to achieve because our fresh pork competes very competitively with theirs.

Smithfield has access to competitively sensitive information from its competitors, through the Agri Stats reports, which allowed it to know confidential supply information from its competitors.

67.     Supply level information regarding competitors allowed them to know that supply would not increase in the future, given the lifecycles of the animals. In February 2011, Tyson's chief operating officer stated:

> I think there is still a widely held belief that our Beef and Pork profitability isn't sustainable. I want to again explain why we don't believe that is true. If we look at supply, current cattle and hogs production levels can't change much in 2011 because of the limits of the animals' lifecycles.

Again, the way to know the level of production in the industry would be though the provision of competitively sensitive information by a competitor of Tyson.

68.     When asked, in the face of ever-increasing margins, whether the type of profits would continue, in March 2011, Smithfield publicly signaled to its competitors that it would not increase capacity, even in the face of the clear profitability:

> LARRY POPE: We closed last night at nearly $64 for hogs. Yet we are projecting over the next 90 days we will be up another 20% from that. I mean those are big numbers to get the meat prices in the retail and food service case to cover that. . . .

> HEATHER JONES: So you are just striking a note of caution ***because you know it can't stay this way indefinitely***; but it's not that you foresee this reversion to that norm over the near term?

BO MANLY: I don't see it on the horizon, on the foreseeable horizon. We are still going to have -- should have good margins, but I can't believe --

LARRY POPE: Heather, we are sitting here today, we are halfway -- closing in on halfway through our fourth quarter, and we have had very good margins through February and March, through today. We have got double-digit margins today.

BO MANLY: It will correct itself over the long run, because this type of return on investment would attract capital, would attract expansion, and we kill more pigs and drive the margins lower. So it will either happen by itself or someone is going to build a plant.

HEATHER JONES: All right, okay. Thank you.

LARRY POPE: You get two-year visibility on that, though. You get to know when somebody is building a plant because they have got to file for a permit and they have actually got to build the thing. . . . ***And by the way, we are not going to build a new plant to expand capacity***.

69.     In March 2012, the VP of Finance and chief accounting officer of Smithfield stated that no one in the industry would be "real excited about adding capacity" when the losses of 24 to 36 months ago were considered:

Nonetheless, you see some pretty significant fluctuations. Just two weeks ago, I think we had -- there were rumors the Chinese buying corn, and boom, all of a sudden the corn market is up $0.20, $0.30. So there is some volatility there. And what I would tell you is that keeps a lid on pork production. The pork guys in the United States have not forgotten 24 or 36 months ago when there were significant losses in the industry. ***There is no one going to be real excited about adding capacity, adding sows at a time when we've got such volatility***.

**E. The pork industry is almost completely vertically integrated, which allowed the scheme to succeed.**

70.     The processing of pig meat can be divided into three stages: (1) hog production, (2) hog processing/intermediate pork processing, and (3) further processing. The pork industry is nearly fully vertically integrated, with four major producers controlling 75 percent of all pork integration. The Defendants are commonly known as "contractors" or "integrators" who contract production of their hogs out to independent growers. Integration is so pervasive that major

producers are commonly called pork or swine integrators by the industry, government, analysts, and academics.

71.     In 2014, Smithfield had approximately 500 company-owned farms and approximately 2,190 contract farms in the United States. Smithfield described its arrangement with contract farms as follows:

> Under our contract farm arrangements, contract farmers provide the initial facility investment, labor and frontline management in exchange for fixed service fees to raise hogs produced from our breeding stock under agreements typically ranging between five and ten years. We retain ownership of the hogs raised by our contract farmers. In 2014, approximately 76% of Smithfield's hogs produced in the U.S. were finished on contract farms.

72.     Fully integrated companies have broad control over production processes, and near-total operational discretion in deciding how much to produce and when. Under these contracts, the pork integrators pay only fixed service fees to the farmers, who bear all of the investment costs of the hog raising facilities. The pork integrator, here Smithfield, retains ownership of the hogs at all points in time. This arrangement essentially converts independent farmers that own their livestock into contract employees that perform services for the pork-packing industry.

**F.  The level of concentration in the pork industry allowed for the alleged collusive scheme.**

73.     The level of concentration in the pork industry was optimal for collusion. Because the industry was dominated by a relative handful of integrators, it was feasible to manipulate price through an agreement among the relatively few dominant players, whose market power greatly simplified the organizational complexity of the price-fixing agreement. Further, because none of the largest producers were capable of independently controlling price through their own production, such an agreement was necessary to inflate price.

23

74.     Prior to and in the beginning of the Relevant Time Period, the pork industry underwent a period of unprecedented concentration, which resulted in a small number of pork integrators controlling a vast amount of market share. Between 1988 to 2015, the top four pork integrators (Smithfield, Tyson, JBS, and Hormel) increased their market share from 34 percent to just under 70 percent. The top eight integrators had a market share exceeding 80 percent during the Relevant Time Period.

75.     The hog production sector is horizontally concentrated and vertically integrated. Some pork packers also produce hogs themselves. Meatpacking concentration levels are among the highest of any industry in the United States, and well above levels generally considered to elicit non-competitive behavior and result in adverse economic performance.

76.     In July 2015, JBS USA announced that it would be acquiring Cargill's pork business for $1.54 billion. This acquisition joined the third and fourth largest pork packing companies to surpass Tyson and became the second largest hog processor in the United States, behind only Smithfield.

77.     The following timeline illustrates notable mergers between pork integrators since 1995 which lead to an increased market concentration:

### History of Mergers and Acquisitions



78.      The Herfindahl-Hirschman index ("HHI") is a widely accepted measurement of market concentration. The HHI for hog processing and intermediate pork processing is 1,838, which exceeds the DOJ threshold for a "moderately concentrated industry."

**G. Barriers to entry helped keep competitors out of the pork integration market and ensured the success of the conspiracy.**

79.      Barriers to entry kept competitors out of the pork integration industry. New entry into pork processing is costly and time consuming. In order to slaughter and process hogs on an industrial scale, a slaughtering plants needs to be constructed. The cost to design and build a 140,000 square foot plant with industry-standing packing equipment and a slaughter capacity of 2,500 hogs a day is estimated at $33 million. In 2012, it cost Cargill $25 million just to expand an existing facility. Large capital outlays such as these can limit market entry, as it can be difficult for new firms to raise this sort of capital.

**H. The inelastic demand for pork supports an inference of collusion.**

80.      Markets with a highly inelastic demand can help facilitate collusion as manufacturers have the ability to raise prices without a significant impact on quantity demanded. Price elasticity of demand ("PED") is a measure used to quantify the degree to which quantity demand for a good or service changes with respect to price.[9] A PED value between 0 and -1 indicates there is inelastic demand for the good or service, i.e., a 1 percent increase in price induces

---

[9] *See, e.g.*, Jeffrey M. Perloff, Microeconomics with Calculus, 28-31 (2d Ed.); Patrick L. Anderson,. et al., *Price Elasticity of Demand* (Nov. 13, 1997), https://scholar.harvard.edu/files/alada/files/price_elasticity_of_demand_handout.pdf; Gadi Fibich, Arieh Gavious & Oded Lowengart, *The Dynamics of Price Elasticity of Demand in the Presence of Reference Price Effects*, 33 J. Academy Mktg. Science 66-78 (2005), *available at* http://www.math.tau.ac.il/~fibich/Manuscripts/elasticity_JAMS.pdf.

a less than 1 percent decrease in quantity demanded. The average PED estimate for the pork market was -0.64, which indicates the demand for pork is inelastic.

### I. The homogeneity of pork facilitated collusion over prices.

81.     Collusion becomes easier for manufacturers of a homogenous product when prices are the only way in which products can be differentiated from one another. Pork loins, bacon, ribs, and other pork products are produced on a commercial scale and sold in supermarkets. For example, pork loin from Tyson and Smithfield are virtually indistinguishable, with similar nutritional values, branding and packaging. These products are highly substitutable, making it easier for competing firms to reach an agreement on a common pricing structure.[10]

### J. The abnormal pricing during the Relevant Time Period demonstrates the success of the collusive scheme.

82.     Beginning in 2009, the pork industry showed abnormal price movements, including increased prices for the average hog, unexplained by increases in costs. Plaintiff has measured the various abnormal pricing movements in several ways, including: (i) the average live hog price, (ii) the pork cut-out composite price, and (iii) the pork integrators' margin during the Relevant Time Period.

83.     According to aggregate prices published by the USDA, the hog market year average price was at or below $50 every year between 1998 and 2009, before increasing to $76.30 in 2015.

---

[10] *See Preventing and Detecting Bid Rigging, Price Fixing, and Market Allocation in Post-Disaster Rebuilding Projects*, The United States Department of Justice, https://www.justice.gov/atr/preventing-and-detecting-bid-rigging-price-fixing-and marketallocation-post-disaster-rebuilding ("The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure. It is much harder to agree on other forms of competition, such as design, features, quality, or service.") (last visited Aug. 16, 2018); Marc Ivaldi. et al., *The Economics of Tacit Collusion* (March 2003), http://ec.europa.eu/competition/mergers/studies_reports/the_economics_of_tacit_collusion_en.p df.

84.     During the Relevant Time Period, various pork products saw substantial increases in prices. Pork cut-out composite prices increased by 56 percent between January 2009 and December 2014, and by 18 percent over the Relevant Time Period.

85.     Also during the Relevant Time Period, pork integrator margins increased significantly. The change in integrator margins during the Relevant Time Period shows a divergence from pricing trends prior to the Relevant Time Period, and shows that rising costs do not explain the increases in prices seen during the Relevant Time Period.

**K.  Overcharges due to the cartel were passed through to through to indirect purchasers.**

86.     The USDA has stated that high levels of market concentration allow the largest participants to extract more of the economic value from food transactions, but "consumers typically bear the burden, paying higher prices for goods of lower quality."

87.     As a matter of economic principle, firms must recover the short-run variable costs of production when they price their products for the market, which ultimately get passed to consumers in the form of higher retail prices. For a firm to be profitable, the firm must recover its marginal cost of production. In a perfectly competitive market, firms price at marginal cost and when marginal costs increase, the cost increases are passed through to the consumer 1:1 or at a 100 percent pass through rate. As a general matter, the pass through rate will be determined by the relative elasticities of supply and demand. When demand is inelastic (as it is for pork) the pass through rate is closer to 100 percent.

88.     The Bureau of Labor Statistics tracks commonly purchased products in its Consumer Price Index ("CPI"). Those prices show that the retail price of pork has increased substantially for consumers over the Relevant Time Period. For example, the price of a pound of bacon has increased from $3.57 at the end of 2009 to $5.60 at the end of 2017:

**CPI-Average Price Data for Bacon, Sliced, per pound, from 1995 to 2017**



89.     Similarly, the CPI index for other pork products, excluding canned ham and luncheon slices, show a marked increase over the Relevant Time Period, moving from $2.05 per pound at the end of 2009 to $2.65 at the end of 2017:

**CPI-Average Price Data for Ham, per pound, from 1995 to 2017**



90.     Given these market conditions, the overcharge due to Defendants' anticompetitive agreement to stabilize the price and supply of pork was passed on to the Commonwealth of Puerto Rico, and its citizens.

**L.  Defendants actively concealed the conspiracy and Plaintiff did not and could not have discovered Defendants' anticompetitive conduct.**

91.     Puerto Rico had neither actual nor constructive knowledge of the facts constituting its claim for relief. Puerto Rico did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Puerto Rico on inquiry notice that there was a conspiracy to fix prices for pork. Throughout the Relevant Time Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Puerto Rico.

92.     The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including but not limited to secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply restraint communications on documents, communicating competitively sensitive data to one another through Agri Stats - a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

93.     In 2009, the President of Agri Stats, Bryan Snyder, commented on how secretive the true nature of Agri Stats was when he stated: "Agri Stats has always been kind of a quiet company. ***There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of just in the background***, and really our specialty is working directly with companies about their opportunities and so forth." (emphasis added).

94.     At the same 2009 presentation, when discussing "bottom line numbers" (a company's net earnings), Mr. Snyder declined to display those numbers publicly, stating "I'm not going to display the actual bottom line to the group here just because of the confidentiality nature of the information." And yet, despite refusing to show this information publicly, Agri Stats provided producers with the "bottom line numbers" of their competitors on a regular basis via the reports discussed above. These statements acted to conceal the true detail and nature of the Agri Stats reports from Plaintiff and the public in general.

95.     Larry Pope, the CEO of Smithfield, made similar references to secret information in December 2010, explaining that he was confident pork supplies would not be increasing in the market, based on "the information we think we have public plus what we think we know privately, how many they kill, what their processing levels are and things like [that]. This is information you may not quite have."

96.     At other times, Defendants attributed the stability in the pork market to other reasons such as "good programs with our retailers" and "lower grain costs." As Larry Pope, stated in June 2012:

> KEN ZASLOW: some confidence that fresh pork margins will improve sequentially throughout the year?

> LARRY POPE: Strong exports, $71 hog today, good programs with our retailers, and lower grain cost in the future and a futures market that says the hog market's going to be fine. I guess beyond that, you've got chicken and beef that are going to be down significantly.

> BO MANLY: And I think there is also some optimism that the US consumer may have some greater disposable income from less gasoline prices and improvement in the economy.

97.     Not until recently was the fact of the pork industry's use of Agri Stats widely known or reported. An investigative article published in February 2017 by Bloomberg Businessweek

suggested the conspiracy that began among broiler producers and Agri Stats was being replicated in the pork industry.[11] The article reported that Agri Stats has

> been branching out into the hog business, which has, over the past 30 years, started to look more and more like the chicken industry, with hogs being raised under contract for vertically integrated companies such as Smithfield Foods. It appears that demand for the service is strong. At a hog industry trade show in 2011, an Agri Stats employee pitched the company's services. His slideshow indicated that 27 companies had already signed up.[12]

98.     While Bloomberg Businessweek article did not conclude that pork producers were engaged in a horizontal conspiracy, it did suggest for the first time in a widely circulated article that the pork industry may have been using Agri Stats as a vehicle for collusion similar to the Broiler industry.

99.     Only after the filing of a February 7, 2018, Second Consolidated and Amended Complaint by the End User Plaintiff Class in the *In Re Broiler Chicken Antitrust Litigation*, Case No. 1:16-cv-08637 (N.D. Ill.), was there a comprehensive presentation of the full scope of the confidential services that Agri Stats' provides to its clients in the Broiler industry.

100.     The filing of that amended complaint, along with the February 2017 article by Bloomberg Businessweek disclosing the pork industry's use of Agri Stats, collectively disclosed the likelihood that the pork industry was using Agri Stats to share confidential industry information that could facilitate an anticompetitive conspiracy.

101.     Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Pork is not exempt from antitrust regulation, and thus, before these recent events, Plaintiff reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the

---

[11] *See* Christopher Leonard, *Is the Chicken Industry Rigged?*, Bloomberg Businessweek (Feb.15, 2017), https://www.bloomberg.com/news/features/2017-02-15/is-the-chicken-industryrigged.
[12] *Id.*

circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' pork prices before these recent events.

102.     By virtue of the fraudulent concealment of their wrongful conduct by Defendants and all of their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Puerto Rico has as a result of the unlawful combination and conspiracy alleged in this complaint.

## V.     ANTITRUST INJURY

103.     Defendants' anticompetitive conduct had the following effects, among others:

A.   Price competition has been restrained or eliminated with respect to pork;

B.   The prices of pork have been fixed, raised, stabilized, or maintained at artificially inflated levels;

C.   Indirect purchasers of pork have been deprived of free and open competition and

D.   End-user consumers of pork who indirectly purchased pork for personal use, paid artificially inflated prices.

104.     The pork that Puerto Rico purchased was in substantially the same form as when it was initially sold by Defendants. As a result, the pork follows a traceable physical chain from Defendants to Plaintiff, and the overcharges on pork can be traced from Defendants to Plaintiff.

105.     Puerto Rico purchases pork through a network of authorized distributors.  These purchases ensure that Puerto Rico can feed its students, prisoners and corrections officers, and hospital patients.  By virtue of Defendants' price-fixing behavior Puerto Rico has been forced to suffer artificially-inflated prices for its purchases of pork during the Relevant Time Period.

106.     By reason of the alleged violations of the antitrust laws, Puerto Rico has sustained injury to its businesses or property, having paid higher prices for pork than it would have paid in

the absence of Defendants' illegal contract, combination, or conspiracy, and as a result has suffered damages.

107.     In addition to purchases by Puerto Rico itself, Puerto Rico also seeks damages for violations of suffered by its citizens.  Puerto Rico seeks to recover these damages on behalf of its citizens and as *parens patriae*.

108.     A sovereign entity such as Puerto Rico may proceed as *parens patriae* to recover damages on behalf of its population if it 1) articulates an interest apart from the interests of particular private parties, (2) expresses a quasi-sovereign interest, and (3) alleges injury to a sufficiently substantial segment of its population. *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 600 (1982).

109.     Puerto Rico has its own interest in protecting the rights of its population, including consumers, from paying artificially-inflated prices for Broilers that cause the cost of living and the cost of tourism to rise.  That interest is distinct from the interest of consumers themselves in avoiding harm as a result of such anticompetitive behavior.  The foregoing is a sovereign interest.

110.     A substantial segment of Puerto Rico's population purchases Broilers from distributors, wholesalers, retailers, and others in Puerto Rico who all paid supra-competitive prices for Broilers as a result of Defendants' anticompetitive conduct, and passed those supra-competitive prices on to Puerto Rican consumers.

111.     Accordingly, Puerto Rico may proceed as *parens patriae* to recover damages on behalf of its population.

112.     This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VI.    CAUSES OF ACTION

## VIOLATION OF THE SHERMAN ACT

### FIRST CLAIM FOR RELIEF
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT 15 U.S.C. § 1

113.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint. Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2009, and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize price for pork in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

114.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

A.  Fixing, raising, and stabilizing the price of pork; and

B.  Allocating among themselves and collusively reducing the production of pork.

115.    The combination and conspiracy alleged herein has had the following effects, among others:

A.  Price competition in the sale of pork has been restrained, suppressed, and/or eliminated in the United States;

B.  Prices for pork sold by Defendants and all of their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

C. Those who purchased pork indirectly from Defendants and their co-conspirators for their personal use have been deprived of the benefits of free and open competition.

116. Plaintiff has been injured and will continue to be injured in its businesses and property by paying more for pork purchased directly and indirectly from the Defendants and their co-conspirators than it would have paid and will pay in the absence of the combination and conspiracy.

117. Plaintiff is entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## VIOLATIONS OF PUERTO RICO ANTITRUST LAWS

### SECOND CLAIM FOR RELIEF
### Violation of the Puerto Rico Antitrust Law
### 10 L.P.R.A. § 251 *et seq.*

118. Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

119. The requirements to demonstrate an infraction of this statute that protects free competition are: (1) that a contract exists between two or more separate entities; (2) which unreasonably restricts commerce, and (3) it occurs in Puerto Rico or any of its sectors. *Pressure Vessels of P.R., Inc. v. Empire Gas de P.R.*, 137 D.P.R. 497, 1994 WL 909547 (P.R. 1994).

120. At all material times, Defendants contracted, combined or conspired in restraint of trade or commerce of pork, and monopolized or attempted to monopolize trade or commerce of pork, in violation of 10 L.P.R.A. §§ 258, 259, and 260.

121. Defendants' conduct had substantial intrastate effects in that, among other things, pork integrators within Puerto Rico were prevented from offering more affordable pork to direct purchasers and indirect purchasers within Puerto Rico. Defendants' conduct materially deprived

the consuming public of Puerto Rico of any choice to purchase more affordable pork. The continued absence of competition directly affects and disrupts commerce within Puerto Rico.

### THIRD CLAIM FOR RELIEF
**Unjust Enrichment**

122.   Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

123.   The doctrine of unjust enrichment requires the following: (1) existence of enrichment; (2) a corresponding impoverishment; (3) a connection between the enrichment and the impoverishment; (4) lack of justification for enrichment, and (5) non-existence of legal principal which would prohibit application of unjust enrichment. *Hatton v. Mun. de Ponce,* 134 D.P.R. 1001, 1994 WL 909605 (P.R. 1994).

124.   Defendants have reaped and retained substantial benefits in the form of higher profits due to their unjust scheme to monopolize the market for pork.

125.   The financial benefits to Defendants from their wrongful conduct are traceable to overpayments for pork by Plaintiff.

126.   Plaintiff has conferred upon Defendants an economic benefit—their profits stemming from anticompetitive overcharges. Plaintiff paid those monopoly overcharges to its substantial economic detriment.

127.   The financial benefits that defendants derived by charging supracompetitive prices for pork directly and proximately resulted from Defendants' unjust practices described herein.

128.   It would be unjust and inequitable for Defendants to be permitted to retain any of the ill-gotten gains from its wrongful monopolization scheme.

129.   The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of pork is ascertainable by review of sales records.

## PRAYER FOR RELIEF

Accordingly, Plaintiff requests that the Court:

A.  Adjudge and decree that Defendants violated section 1 of the Sherman Act, 15 U.S.C. § 1;

B.  Adjudge and decree that the foregoing activities violated each of the statutes enumerated in this Complaint;

C.  Enjoin and restrain, pursuant to federal and state law, Defendants, their affiliates, assignees, subsidiaries, successors, and transferees, and their officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from continuing to engage in any anticompetitive conduct and from adopting in the future any practice, plan, program, or device having a similar purpose or effect to the anticompetitive actions set forth above;

D.  Award to Plaintiff disgorgement of the Defendants' ill-gotten gains and other equitable relief as the Court finds appropriate to redress Defendants' violations of federal law or state antitrust and consumer protection laws to restore competition;

E.  Award to Plaintiff damages, including treble damages, to the extent sought;

F.  Award to Plaintiff its costs, including reasonable attorneys' fees; and

G.  Order any other relief that this Court deems proper.


Dated: July 9, 2019

                                        Respectfully Submitted,

                                        /s/ Kyle G. Bates
                                        Wanda Vázquez-Garced
                                        Attorney General

Johan M. Rosa Rodríguez
PR Bar No. 16819
Assistant Attorney General
Antitrust Division
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, Puerto Rico 00902-0192
Tel: (787) 721-2900, ext. 2600, 2601
Fax: (787) 721-3223
jorosa@justicia.pr.gov

Todd M. Schneider
Kyle G. Bates (USDC-PR 306412)
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell St., Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
kbates@schneiderwallace.com

Peter B. Schneider
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
3700 Buffalo Speedway, Suite 300
Houston, Texas 77098
Telephone: (713) 338-2560
Facsimile: (415) 421-7105
pschneider@schneiderwallace.com

**ATTORNEYS FOR THE
COMMONWEALTH OF PUERTO
RICO**